# CHASE COMMERCIAL PURCHASING CARD PROGRAM

## Master Agreement

This Chase Commercial Card Program Master Agreement (the **"Agreement"**) is dated as of _OCTOBER 1_ , 2004, between **UNIVERSAL WEATHER AND AVIATION, INC.** (the **"Company"**), a _PRIVATE_ corporation, and **CHASE MANHATTAN BANK USA, National Association ("Chase")**, a Delaware corporation.

### RECITALS

WHEREAS, Chase is a member and licensee of Visa U.S.A., Inc. (**"Visa"**) and MasterCard International, Inc. (**"MasterCard"**), authorized to issue Visa and MasterCard credit cards bearing Visa and MasterCard logos and service marks, to open Visa and MasterCard accounts and to offer Visa and MasterCard services and benefits as they may be made available; and

WHEREAS, Chase has developed a commercial card system composed of Visa and MasterCard credit cards, card-use controls, and specialty reports to facilitate purchases of and payments for business goods and services (the **"Program"**); and

WHEREAS, the Company desires to participate in the Program, subject to this Agreement and the attached Exhibits A and B;

NOW, THEREFORE, the parties agree as follows:

**1. DEFINITIONS.** Unless the context requires otherwise:

**"Account"** means the Visa or MasterCard account of a Cardholder and/or the Company maintained with Chase.

**"Billing Cycle"** means a monthly period ending on the same day each calendar month. If that day is not a Business Day, the period ends on the preceding or next Business Day.

**"Business Day"** means a day, not a Saturday or Sunday, on which commercial banks generally are open for business in both Salt Lake City, Utah and New York, New York.

**"Card"** means a Visa or MasterCard charge card issued by Chase pursuant to this Agreement.

**"Card Cancellation Confirmation"** means a written statement, in form and substance satisfactory to Chase, identifying certain Cards by Account numbers and Cardholder names and confirming (i) that the Company has retrieved and destroyed such Cards, or (ii) that the Company used reasonable efforts to retrieve such Cards but was unable to do so.

**"Cardholder"** means (i) an individual in whose name a Card is issued, and (ii) any employee, officer, director or person authorized by the Company or named Cardholder to use a Card or Account.

**"Cardholder Agreement"** means an agreement between Chase and a Cardholder, as amended from time to time, governing use of a Card.

**"Transaction"** means a purchase, a cash advance, the use of a convenience check, or any other activity that debits an Account.

**2. LIABILITY FOR USE.**

(a) Regardless of any established credit limits, the Company agrees to pay and perform when due all of its obligations, including without limitation:

(i) all indebtedness, charges, fees and other obligations and amounts payable under or in connection with each Account; and

(ii) all expenses (including reasonable attorneys' fees) incurred in enforcing the obligations of the Cardholder and the Company hereunder.

(b) Except for notices expressly required by this Agreement, the Company waives all demand, presentment, protest, notices thereof, notices of dishonor, and all other notices or formalities as conditions to collection or enforcement of any obligation. The Company also waives notice of the existence, creation or occurrence of new or additional obligations by Cardholders.

(c) All amounts due under the Cards and Accounts shall be billed to the Company via periodic statements, due in full upon receipt.

(d) All payments shall be made in U.S. dollars.

(e) All charges will be posted to Accounts in U.S. Dollars. Transactions in foreign currencies will be converted to U.S. Dollars at the exchange rate determined by MasterCard (or its affiliates) or Visa (or its affiliates), using its then current currency conversion procedures and charges. The currency conversion rate used on the conversion date may differ from the rate in effect on the date a Card or Account is used.

3. **FEES.** The Company agrees to pay all applicable fees described in **Exhibit B.** Such fees will be included in the billing statement for the Billing Cycle in which they accrued. Fees not listed in **Exhibit B** but agreed to in writing by both parties may be invoiced separately, payable upon receipt.

4. **TERM.** This Agreement shall have an initial term (the **"Initial Term"**) of five years (with the first year of the initial term being a 15-month period) beginning on the date hereof, and shall renew automatically for successive two-year terms (each a **"Renewal Term"**) unless written notice of termination is given by a party at least 120 days prior to the end of the Initial Term or any Renewal Term. In addition, a party may terminate this Agreement for convenience at any time upon 120 days' prior written notice.

5. **DEFAULT.** As used herein, **"Default"** includes: (i) the Company failing to remit any payment to Chase as required by this Agreement, unless such payment is made within 5 business days of the relevant payment due date or the Company has provided written notification to Chase that it disputes the amount due; (ii) either party breaching any other term of this Agreement, or any other agreement between them, unless that breach is cured within 30 days of written notice specifying the breach; (iii) any representation of fact by the Company in this Agreement or in any financial information it provided to Chase being materially incorrect or misleading when made, as long as Chase has provided written notification to the Company and the Company has had an opportunity to explain the alleged misrepresentation or mistake; (iv) either party filing or suffering a petition as debtor in any bankruptcy, receivership, reorganization, liquidation, dissolution or other similar proceedings, or making any assignment for the benefit of creditors; (v) the Company suffering any adverse judgment, order or award, or suffering any other event, having a material adverse impact on its financial condition, its ability to perform its obligations under this Agreement, or the possession or control of its assets; (vi) any direct or indirect change in control of, or material change in ownership of, the Company (including any act to consolidate or merge, or sell a substantial portion of its assets) that has a material adverse effect on the Company; (vii) either party's insolvency or dissolution; (viii) default by the Company under any material debt owed to any Chase-related entity or to any third party; and (ix) fraudulent or other unauthorized use of Cards or Accounts, or credit losses with respect thereto, that exceed Chase's operating tolerances, as long as Chase has provided written notification to the Company and the Company has had an opportunity to explain the alleged misuse or losses.

6. **REMEDIES; DAMAGES.**

(a) Either party may terminate this Agreement upon Default by the other party. Except for remedies expressly provided herein, termination will be a party's sole remedy for breach of this Agreement. In no event, however, shall termination or expiration release or discharge Company from its duty to pay all amounts otherwise payable under this Agreement.

(b) In lieu of immediate termination, Chase, in its sole discretion, may suspend its services and obligations hereunder, or may shorten the Billing Cycle, until Chase is satisfied that the Company's Default has been cured. By forbearing from immediate

termination, Chase shall not waive it continuing right, as a result of the Default or otherwise, to proceed with termination.

(c) A breaching party shall be liable only for actual direct damages caused by its breach of this Agreement or a Cardholder Agreement, or by its gross negligence or willful misconduct. In no event, whether in contract, tort, strict liability or other form of action, shall either party be liable for any punitive, exemplary, special, indirect or consequential damages (including, without limitation, costs to develop and implement the Program, or lost revenues, profits, or economic advantage) arising from, in connection with or relating to any performance or nonperformance under this Agreement or the Program, even if that party knew or was advised of the likelihood of such damages. Each party hereby releases and waives all present and future claims against the other for such excluded damages. Without limiting the foregoing generality of this section, Chase shall not be liable for any damages of any kind, no matter what the cause or nature, that arise, occur or result from: (i) the Company using Java applets or other Java applications, (ii) the Company's opening ports on its firewalls, or (iii) problems with or defects in equipment, software or services not provided by Chase.

(d) In addition to all its other rights, upon Default by Company, or Chase deeming itself insecure, Chase may accelerate and demand payment of, and may set off against any liabilities, the total balance of monies owed to Chase by Company in any capacity. Chase shall be deemed to have exercised its set off and charged against such monies immediately upon the event of Default (or Chase deeming itself insecure), even if the charge is made or entered on Chase's book on a later date.

7. **REPRESENTATIONS AND WARRANTIES.** Each party represents and warrants that this Agreement constitutes its legal, valid, binding and enforceable agreement, and that execution and performance of this Agreement (a) do not breach any agreement of such party with any third party, or any duty arising in law or equity, (b) do not violate any law, rule or regulation applicable to it, (c) are within its corporate powers, and (d) have been authorized by all necessary corporate action of such party.

8. **CHANGES.** This Agreement may be changed only by written agreement signed by both parties. Changes to any Cardholder Agreement shall be effective immediately upon receipt by the Cardholder of notice of the changes.

9. **FINANCIAL STATEMENTS; NOTICE OF BOND RATING CHANGE.** The Company shall furnish Chase with copies of its consolidated audited financial statements, including annual income statement and balance sheet, prepared in accordance with GAAP, as soon as available and no later than 120 days after the end of each fiscal year. The Company shall provide such other current financial information as Chase may request from time to time. If applicable, the Company will notify Chase within five days of any change in the Company's bond rating.

10. **ASSIGNMENT.** This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective successors and assigns; provided, that the Company may not assign

this Agreement or any interest, payment, or rights hereunder without the prior written consent of Chase.

**11. FORCE MAJEURE.** If a party is rendered wholly or partly unable to perform its duties under this Agreement by a force outside its control (*e.g.*, an act of God, war, fire, flood, act of governmental authority, strike, civil disturbance or breakdown of telephone, computer or automated mailing equipment), or if Chase is notified by state or federal regulators or by Visa or MasterCard that any aspect of the Program or this Agreement does not comply with any applicable law, regulation, rule, policy, or order, that party shall give prompt written notice of that fact. The affected obligations of the notifying party shall be suspended without causing a breach or Default so long as that party remains unable to perform for that reason; provided, however, suspension of a payment obligation hereunder shall not extend for more than 60 days after notification of the force majeure event, after which the inability to perform a payment obligation shall be considered a breach or Default. The notifying party shall exercise reasonable efforts to timely resume performance.

**12. ENTIRE AGREEMENT.** This Agreement contains the parties' entire understanding on the subject matters herein, and supersedes all prior discussions, representations and agreements. All attached exhibits and addenda are incorporated by this reference.

**13. SEVERABILITY AND WAIVER.** If any portion of this Agreement is stricken as invalid, the remaining portions shall remain in full force and effect. Failure of either party to exercise any of its rights in a particular instance shall not be construed as a waiver of those rights or any other rights for any purpose.

**14. CHOICE OF LAW; JURISDICTION; WAIVER OF JURY.** This Agreement is made in, and all credit is extended from, the State of Delaware. This Agreement shall be governed by and construed under the substantive laws of the State of Delaware and applicable federal law. Both parties hereby waive any right to personal service of any process in connection with any action, and hereby agree that service may be made by registered or certified mail addressed to itself as specified in Section 19. The parties hereby waive any right to a trial by jury.

**15. SURVIVAL.** Sections 2, 6, 10, 13 14, 16 and 19 shall survive the termination or expiration of this Agreement.

**16. CONFIDENTIALITY.** All information furnished by either party in connection with this Agreement, the Program, or Transactions there under shall be kept confidential and used by the other party only in such connection, except to the extent such information (a) is already lawfully known when received, (b) thereafter becomes lawfully obtainable from other sources, (c) is required to be disclosed in any document filed with the Securities and Exchange Commission, banking regulators, or any other governmental agencies, or (d) is required by law to be disclosed and notice of such disclosure is given (when legally permissible) by the disclosing party. Notice under (d), when practicable, shall be given sufficiently in advance of the disclosure to permit the other party to take legal action to prevent disclosure. Each party shall advise all employees, consultants, agents and other representatives (collectively, **"representatives"**) who will have access to confidential information about these obligations. A party shall disclose confidential information only to its representatives involved in this Agreement, the Program, or the Transactions. Upon termination of this Agreement, each party shall promptly return to the other party all copies of documents or extracts containing confidential information; provided, that each party may retain copies of materials it deems necessary solely for archival purposes.

**17. NAME AND TRADEMARK.** Except as otherwise provided herein, neither party shall use the name or logo of the other party without its written consent.

**18. RELATIONSHIP OF PARTIES.** Nothing contained in this Agreement shall constitute or create a partnership, joint venture, agency, or other relationship between Chase and the Company. To the extent either party undertakes or performs any duty for itself or for the other party as required by this Agreement, the party shall be construed to be acting as an independent contractor.

**19. NOTICES.** Any notice under this Agreement shall be in writing and delivered personally, by nationally-recognized overnight delivery service, or by prepaid registered or certified mail, addressed as specified in Exhibit B for notices (or such other address as such party may have designated in writing). Notice is deemed delivered on (i) the date of personal service, (ii) the Business Day after timely deposit for overnight delivery, or (iii) three Business Days after deposit in the U.S. Mail.

0338

Chase Manhattan Bank USA, N.A.
05-2004
Universal Weather and Aviation, Inc. Agreement
Confidential

IN WITNESS WHEREOF, the parties hereto have by their duly authorized representatives executed this Agreement as of the day and year first written above.

**CHASE:**

**CHASE MANHATTAN BANK USA, N.A.**

By: _Clare J. Trauth_

Name: _Clare T. Trauth_

Title: _Vice President_

**COMPANY:**

**UNIVERSAL WEATHER AND AVIATION, INC.**

By: _Ralph Vasami_

Name: _RALPH T. VASAMI_

Title: _President_

**Company Attestation:**

The undersigned, a duly authorized officer or representative of the Company, does hereby certify that the Company has been duly authorized to enter into and perform this Agreement and that the person signing above on behalf of the Company, whose execution of this Agreement was witnessed by the undersigned, is an officer, partner, member or other representative of the Company possessing authority to execute this Agreement.

By: _David L. Diulus_ *

Name: _David L. Diulus_

Title: _V.P W air_

*Note: The person signing the attestation shall be someone different from the person signing above on behalf of the Company.

0339

# EXHIBIT A

## CARD AND ACCOUNT CAPABILITIES, ISSUANCE AND USE

### SECTION 1
### CARD CAPABILITES

The Company's Card and Account capabilities are limited to Purchasing Card capabilities so that Cardholders may purchase goods and services, as defined and limited by the Cardholder Agreement as provided to the Cardholders, for the benefit of their respective companies, or as employees of the Company for the benefit of the Company. "Purchasing Card" shall mean each plastic purchasing card which Chase issues to the Company to be used for Transactions in connection with the procurement of goods and services incidental to the Company's business or business activities.

### SECTION 2
### CARD ISSUANCE

**2.1 PROGRAM PARTICIPATION.** Subject to the terms of this Agreement, Chase shall issue Cards to, and/or establish Accounts for, the Company with such capabilities as may be elected by the Company. Each Card shall be issued for a period of three years, unless otherwise agreed by the parties. For the issuance of Cards and Accounts contemplated by this Agreement, Chase shall be the exclusive provider to the Company; provided, however, the Company may engage in discussions and pre-implementation activities with another provider after sending or receiving a written notice of termination of this Agreement.

**The Company and Cardholders shall use the Cards and Accounts for business or commercial purposes only and not for personal, family, or household purposes. The Company shall instruct all Cardholders in this limitation, as defined and limited by the Cardholder Agreement as provided to the Cardholders.**

**2.2 EMBOSSING; LICENSE TO USE MARKS.** Chase shall prepare Cards bearing the Cardholder's name and, if elected, the Company's name, trademark, or logo (the **"Marks"**) in a form supplied by the Company and conforming to Chase and Visa/MasterCard guidelines. The fee for embossing Cards with a Company Mark is set out in Exhibit B. If the Company elects to have its Marks embossed on the Cards or provides them to Chase for other uses, the Company hereby grants Chase a non-exclusive limited license to apply the Marks to the Cards solely for use in connection with the Program and for no other purpose.

**2.3 CARD DELIVERY.** Chase may deliver Cards and/or related materials to the Company, or directly to the relevant Cardholders. Upon its receipt of any Card, the Company shall promptly deliver that Card to the named Cardholder, together with any related materials supplied by Chase. From time to time during this Agreement, Chase may recommend and/or implement security procedures regarding the custody and handling of Cards. The Company agrees to comply with such security procedures.

**2.4 CREDIT LIMITS; CREDITWORTHINESS.**

(a) Subject to the terms of this Agreement and any Cardholder Agreements, Chase shall authorize extensions of credit with respect to (i) each Card or Account up to a specified total dollar amount (the **"Account Credit Limit"**), and (ii) all Cards and Accounts up to a specified total dollar amount (the **"Aggregate Credit Limit"**). In no event shall Chase be obligated to grant credit in excess of any applicable Credit Limit. Chase may investigate the financial condition of the Company at any time in connection with the issuance of Cards, maintenance of Accounts, and establishment of Credit Limits.

(b) Chase at any time may cancel or suspend the right of any Cardholder to use any Card or Account, or decline to issue or establish any Card or Account. As a result of its periodic evaluation of the Company's financial condition, Chase may increase or decrease any Account Credit Limit or the Aggregate Credit Limit, modify the time for payment of corporate obligations, or require the provision of collateral or additional collateral.

**2.5 ISSUANCE, RENEWAL, REPLACEMENT AND CANCELLATION OF CARDS.**

(a) After executing this Agreement and subject to written notification to Chase from the Company that the Company has completed its preparation for implementation of the Purchasing Card program contemplated by this Agreement, the Company will provide to Chase a written or electronically transmitted request (a **"Card Request"**) listing each Cardholder to whom the Company wishes Chase to issue a

Card or establish an Account. The Company may thereafter submit additional Card Requests for new Cards or Accounts. All Card Requests shall be in a form approved by Chase, and include all information required by Chase. By submitting a Card Request, the Company represents to Chase that the information contained therein is consistent with the Company's records. All Card Requests shall be delivered to Chase in a secure encrypted or password protected format.

(b) Unless Chase receives contrary written instructions from the Company, and subject to Chase's rights under this Agreement, Chase shall replace each expiring Card with a replacement Card within 30 days prior to the Card's expiration date.

(c) Each Cardholder must sign the Card issued to that Cardholder, and shall be subject to the terms of any Cardholder Agreement.

(d) The Company shall immediately request, pursuant to Section 2.5(e) below, that a Card or Account be canceled, or that the authority of a Cardholder to use a particular Card or Account be terminated, when:

   (i) The Company or a Cardholder knows of or suspects the loss, theft or possible unauthorized use of a Card or Account.

   (A) The Company shall not be liable for any Transactions occurring on that Card or Account after the effective time of such request.

   (B) The Company shall not be liable for Transactions resulting from Card theft or other fraudulent use by non-Cardholders, occurring on that Card or Account prior to the effective time of such request, if the suspected loss, theft or unauthorized use was promptly reported to Chase in accordance with Section 2.5(e) below; provided, however, that the Company shall be liable for such Transactions if the theft or other fraudulent use results from the Company's lack of reasonable security precautions and controls surrounding the Cards or Accounts, or if such use results in a direct or indirect benefit to the Company or any Cardholder;

   (ii) The Company wishes to cancel a Card or Account, or to terminate the authority of any Cardholder to use a particular Card or Account. In such event, the Company shall not be liable for any Transactions occurring on the Card or Account (or Transactions made by such Cardholder, as the case may be) after the effective time of such request; or

   (iii) The Cardholder's employment or other relationship with the Company or status as a client of the Company is terminated. In such case, the Company agrees to provide such documentation or information, and to take such actions, as Chase may request in connection with a corporate liability waiver claim with Visa, MasterCard or any insurer relating to such terminated Cardholder. Any balance outstanding associated with such Cardholder shall become immediately due and payable. Chase will make available to the Company any corporate liability waiver coverage extended by Visa or MasterCard. If the effective time of the Company's request is not within two Business Days after the termination, or if the Company fails to provide the documentation or take the actions requested by Chase as a result of such termination, the Company shall be liable for all Transactions with respect to such Cardholder's Card and Account occurring prior to the effective time of the Company's request, but the Company shall not be liable for any Transactions occurring on the Card or Account after such time.

(e) Each request or report made pursuant to Section 2.5(d) shall be made by telephone (at 1-800-270-7760 or such other number as Chase may provide), fax, electronic mail, or PaymentNet™ and shall specify (i) the relevant Cardholder's name, Account number, and last known business and home addresses and telephone numbers, and (ii) such other information as the Company shall deem appropriate or Chase shall reasonably request. The Company's request shall be deemed effective when Chase receives such request and makes the corresponding changes in its processing system (which changes shall be made promptly, taking into account the mode of transmission and time of receipt).

## 2.6 TRANSACTION DATA, SECURITY PROCEDURES AND ACCOUNT MAINTENANCE.

(a) Through PaymentNet™, Chase shall provide the Company with password-protected daily access to Card and Account transaction data and other reports. Such reporting shall be provided in accordance with such manuals, training materials and other information as Chase shall provide from time to time.

(b) For the use of PaymentNet™, the Company agrees to be bound by and follow the security procedures, terms, and conditions (the "Security Procedures") that Chase may adopt and revise from time to time upon notice to the Company, including the following:

   (i) PaymentNet™ may be accessed solely through the use of a user identification code and password (collectively, the "Access Code"). Chase shall assign an initial Access Code to an individual authorized to create and disseminate additional Access Codes (such individual is referred to as the "Program Administrator"). An authorized officer of the Company shall designate the Program Administrator.

(ii) The Company Program Administrator shall (1) create and disseminate Access Codes to individuals designated by the Company as authorized to access and use PaymentNet™ (such individuals are referred to as "**Authorized Users**") and (2) designate additional Program Administrators within the Company. The Company shall be responsible for ensuring that each Program Administrator creates and disseminates Access Codes in accordance with Chase's Security Procedures.

(iii) The Company shall safeguard all Access Codes and be responsible for all use of Access Codes issued by the Program Administrator(s). Chase may conclusively presume that any access, transaction or business conducted using an Access Code emanates from a Program Administrator or Authorized User and is conducted in the Company's name for the Company's benefit. Any unauthorized use of an Access Code (except for unauthorized use by a Chase employee) shall be solely the responsibility of the Company.

(c) The Company may from time to time, and in accordance with guidelines established by Chase, perform certain account maintenance functions, including, without limitation, adjustment of Account Credit Limits and blocking of Visa and MasterCard Merchant Category Codes ("**MCCs**"). The Company, on behalf of itself and its affiliates, owners, directors, officers, employees, agents, and representatives (collectively, the "**Company Group**"), hereby releases and agrees to indemnify and hold harmless Chase, its affiliates, and their respective directors, officers, employees, agents, and representatives (collectively, the "**Chase Group**") from and against any loss, claim, damages, liability, cost, expense, action or cause of action whatsoever that any of them now have or may hereafter have against any member of the Chase Group, or to which any member of the Chase Group may become subject, arising out of or relating to (i) actions taken by Chase upon the instructions of the Company or any Program Administrator or Authorized User, or (ii) any maintenance activity performed by any member of the Company Group or any other person using a Company Access Code or other Company password.

## SECTION 3
## CARD AND ACCOUNT USE

**3.1 PURCHASES.** Provided that a Transaction authorization is required, Chase shall use reasonable efforts to decline any (a) request for purchase authorization that falls outside the Company's permitted MCCs, and (b) Transaction that Chase believes is not authorized or in excess of any established transactional limits. The Company acknowledges, however, that authorizations and declinations are necessarily based on the accuracy of the Transaction data transmitted to Chase. Under no circumstances shall Chase be liable to the Cardholder or the Company (nor shall the Cardholder or the Company be relieved of any obligation to pay the amounts charged or advanced) if a Transaction is permitted on the basis of inaccurate or misleading data or other factors beyond the reasonable control of Chase.

**3.2 USE OF CARDS.** Each Transaction is subject to the terms and conditions of any Cardholder Agreement in effect at the time of the Transaction. Chase shall have no obligation or responsibility to the Company or any Cardholder if any merchant, entity or person refuses to honor a Card or Account. A Card or Account may be used only by the Cardholder to whom it is issued or who is otherwise authorized to use it, and may not be transferred to another Cardholder or any other person or entity.

Without limiting any of its other rights, Chase may decline any Transaction if: (a) any balance owed on that Account or owed by the Company on any other Account is past due, or (b) any other reason for declining a Transaction exists in this Agreement, in any Cardholder Agreement, in the operating regulations of Visa or MasterCard, or under applicable law. Chase will follow Visa and MasterCard rules and regulations with regard to disputed Transactions and chargebacks. Chase shall attempt to effect chargebacks to merchants in accordance with Visa or MasterCard procedures, but no chargebacks will be granted for theft or other fraud-related Transactions resulting from use of any Card on which no Cardholder's name is embossed.

**3.3 OBLIGATIONS OF THE COMPANY.** The Company shall make commercially reasonable efforts to (a) not exceed, or permit Cardholders to exceed, the Aggregate Credit Limit or any Account Credit Limit; and (b) ensure that Cardholders comply with any Cardholder Agreement. Prior to expiration or termination of this Agreement for any reason, the Company shall (i) retrieve all Cards from Cardholders, cut them in half and return them to Chase, or (ii) provide Chase with a Card Cancellation Confirmation for the Cards.

**3.4 COMPANY OBLIGATIONS RELATING TO DISCLOSURE OF ACCOUNT INFORMATION AND INTERNATIONAL PROGRAMS.** The Company shall clearly disclose to each of its Cardholders the extent, if any, to which Chase will provide Transaction and Account information to third parties, or to an alliance bank through an international card program. Such information may include, but is not limited to, names, addresses, Account numbers, points earned, and Transaction details, etc. Furthermore, while it is anticipated by the parties hereto that the Company will eventually issue Cards to individuals residing outside the United States, the Company shall notify Chase of all instances when Cards will be issued to individuals residing outside the United States. The Company, on behalf of the Company Group, hereby releases and agrees to indemnify and hold harmless each member of the Chase Group from and against any loss, claim, damages, liability, cost, expense, action or cause of action whatsoever that any member of the Company Group may have against any member of the Chase Group, or to which any member of the Chase Group may become subject, arising out of or relating to the provision by Chase of

Transaction or Account information to third parties, where provision of such information by Chase has been in conformance with the limitations disclosed by Chase, or resulting from the issuance of Cards to individuals residing outside the United States.

**3.5 CASH ADVANCE.** If the Company elects to add cash advance capabilities to the Cards and Accounts so that Cardholders may obtain cash advances for business or commercial purposes, Chase shall provide access to cash through participating Automated Teller Machine ("**ATM**") networks and Visa and MasterCard member offices. Cardholders who are so authorized may obtain cash by activating an ATM with a Card or by presenting the Card at a Visa and MasterCard member office. Chase may establish predetermined cash advance limits for each Cardholder as agreed by Chase and the Company. Chase may refuse cash advance access to any Cardholder in its sole discretion. The cash advance feature may be disabled by the Company upon written notice to Chase.

**3.6 CONVENIENCE CHECKS.** If the Company elects to add Convenience Check capabilities to the Cards and Accounts so that Cardholders may use Convenience Checks for business or commercial purposes, Chase will provide authorized Cardholders access to Convenience Checks during implementation and then provide replenishment as needed thereafter. Chase may establish predetermined Convenience Check limits for each Cardholder as agreed by Chase and the Company. The Company shall have full corporate liability for all Convenience Checks used.

0343

Chase Manhattan Bank USA, N.A.
05-2004
Universal Weather and Aviation, Inc. Agreement

Confidential

# EXHIBIT B

## FINANCIAL INCENTIVES AND FEES

1.  **Pricing Assumptions:**

    Pricing assumptions with respect to Net Spend, number of Accounts to be requested, average purchase Transaction amount, and Average File Turn are as follows:

    For Purchasing Cards:

    | Contract Year | Net Spend | Number of Cards |
    |---|---|---|
    | Year 1 | $25,000,000 | 250 |
    | Year 2 | $50,000,000 | 500 |
    | Year 3 | $100,000,000 | 1,000 |
    | Year 4 | $150,000,000 | 1,500 |
    | Year 5 | $150,000,000 | 1,500 |

    Average purchase Transaction amount:  $500
    Average Fileturn:  16-29 days

    "Net Spend" means the aggregate amount of individual purchases posted to Accounts, net of the aggregate amount of all refunds to Accounts (such as credits for returned merchandise or disputed billing items), and shall not include those amounts representing annual administration fees, finance charges and other fees or charges posted to Accounts (such as late fees, returned check fees, cash advance fees, collection costs, administrative fees and reporting fees).  Net Spend shall also exclude fraudulent or unauthorized charges posted to the Accounts and any amounts posted to an Account with respect to which a Card has been reported lost or stolen. To the extent large ticket interchange rates or other non-standard interchange rates are applicable, no more than five percent of the total Net Spend shall qualify for such rates. Large Ticket Interchange is defined as the interchange applicable to transactions deemed to qualify as Large Ticket Transactions by the relevant card association, according to its rules and regulations applicable at the time the transaction occurs.  Other non-standard interchange rates include any rates that are different from the interchange rates that are ordinarily applied by the relevant card association, according to its rules and regulations applicable at the time the transaction occurs.

    "Average Fileturn" means the number of days between the Transaction posting date and the payment posting date of the full amount due, averaged over the Contract Year

0344

Chase Manhattan Bank USA, N.A.
05-2004

Universal Weather and Aviation, Inc. Agreement

Confidential

## 2. Performance Incentive.

Calculation of Incentive. For each Contract Year (or, if this Agreement is terminated prior to the end of a Contract Year, the period from the end of the preceding Contract Year to the termination date), Chase shall pay to the Company an incentive calculated as a percentage of the Net Spend for such period, in accordance with the following table and terms (the "Incentive").

| PURCHASING VOLUME ONLY | Annual Net Spend | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Fileturn | $25,000,000 to $49,999,999 | $50,000,000 to $74,999,999 | $75,000,000 to $99,999,999 | $100,000,000 to $124,999,999 | $125,000,000 to $149,999,999 | $150,000,000 to $199,999,999 | $200,000,000 & Over |
| 5 Days or less | 1.23% | 1.31% | 1.36% | 1.39% | 1.41% | 1.42% | 1.43% |
| 6 - 10 Days | 1.17% | 1.25% | 1.30% | 1.33% | 1.35% | 1.36% | 1.37% |
| 11 - 15 Days | 1.12% | 1.19% | 1.24% | 1.28% | 1.29% | 1.30% | 1.31% |
| 16 - 20 Days | 1.06% | 1.14% | 1.18% | 1.22% | 1.23% | 1.24% | 1.26% |
| 21 - 25 Days | 1.00% ✓ | 1.08% | 1.13% | 1.16% | 1.18% | 1.19% | 1.20% |
| 26 - 30 Days | 0.94% | 1.02% | 1.07% | 1.10% | 1.12% | 1.13% | 1.14% |

| Average Transaction Size | | | Incentive Adjustment |
|---|---|---|---|
| $250 | to | $499 | -0.05% |
| $500 | to | $749 | 0.00% |
| $750 | to | $999 | 0.00% |
| $1,000 | to | $1,999 | 0.00% |
| $2,000 | & Over | | 0.01% |

0345

Chase Manhattan Bank USA, N.A.
05-2004

Universal Weather and Aviation, Inc. Agreement

Confidential

| Actual Interchange Rate | | | Incentive Adjustment |
|---|---|---|---|
| 2.200% | | & Over | 0.33% |
| 2.175% | to | 2.199% | 0.30% |
| 2.150% | to | 2.174% | 0.28% |
| 2.125% | to | 2.149% | 0.25% |
| 2.100% | to | 2.124% | 0.23% |
| 2.075% | to | 2.099% | 0.21% |
| 2.050% | to | 2.074% | 0.18% |
| 2.025% | to | 2.049% | 0.15% |
| 2.000% | to | 2.024% | 0.12% |
| 1.975% | to | 1.999% | 0.09% |
| 1.950% | to | 1.974% | 0.06% |
| 1.925% | to | 1.949% | 0.03% |
| 1.900% | to | 1.924% | 0.00% |
| 1.875% | to | 1.899% | -0.02% |
| 1.850% | to | 1.874% | -0.05% |
| 1.825% | to | 1.849% | -0.07% |
| 1.800% | to | 1.824% | -0.10% |
| 1.775% | to | 1.799% | -0.12% |
| 1.750% | to | 1.774% | -0.14% |
| 1.725% | to | 1.749% | -0.17% |
| 1.700% | to | 1.724% | -0.19% |

The applicable payment grid for the incentive payouts will be based on "Annual Net Spend" and "Average Fileturn". Annual Net Spend is defind as Net Spend during the Contract Year. In all cases, the Incentive is calculated annually and is payable within 60 days after the end of each Contract Year. In the event that the due date for any Incentive payment falls on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

In the event this Agreement is terminated prior to the end of a Contract Year, the actual Net Spend for the elapsed portion of such Contract Year shall be annualized solely for the purpose of determining, in accordance with the foregoing table, the percentage to be applied to such actual Net Spend.

The Incentive is subject to reduction by all Losses. If Losses in one year exceed the amount of any or all Incentives earned, Chase may carry forward the amount of such Loss to offset against future Incentives or invoice the Company for the balance owing, which shall be payable within 14 days ("Carryforward Losses"). The Incentive shall be determined by deducting the Losses incurred by Chase on the Company's Accounts during the twelve-month Incentive period and any outstanding Carryforward Losses from the gross Incentive amount for such period. Upon termination of this Agreement, the Losses for the preceding six-month period ending on the termination date (the "Last Six-Month Period") will be deemed, for purposes of calculating the Incentive, to be equal to the Losses for the six-month period immediately preceding the Last Six-Month Period plus any outstanding Carryforward Losses.

The Incentive shall be calculated only on qualified Net Spend sales volume. If the Company is participating in more than one Chase Card Program, Chase reserves the right to offset any Losses from one Program against any Incentive earned under any other Program. If more than five percent of the total Net Spend is attributed to large ticket or non-standard interchange rates, Chase will determine the Incentive payable for the portion of the Net Spend that includes large ticket or non-standard interchanges rates.

Definitions.

"Contract Year" means a 12-month period (with the first Contract Year being a 15-month period) beginning on the date hereof or an anniversary of such date.

"Losses" means losses incurred by Chase on Accounts for collection fees (including cardholder late and delinquency fees) paid and due to fraud or other unauthorized use and all other amounts that are outstanding under Accounts and are not paid within 180 days of their respective due dates. Losses also include all monies owed by Company in any capacity, whether or not due, and Chase shall have the right to set off such losses against any Incentive payable. Any subsequent recovery of such losses by Chase will be credited back to the Company.

3. **Draws Against Incentive.**

  (i)  Chase shall pay to the Company a draw against future Incentive payments in the amount of 75% of each Contract Year's estimated Incentive and paid at the beginning of each Contract Year.

  (ii)  The amount of such draw shall be credited against Incentives earned by the Company until the aggregate amount of Incentives so credited equals the amount of such draw.

  (iii)  If the amount of the draw paid by Chase hereunder exceeds the aggregate amount if Incentives credited against such draw as of the date of termination of this Agreement, the Company shall pay the amount of such excess to Chase within 45 days after such termination. If, as of the date of termination of this Agreement, the aggregate amount of Incentives earned by the Company hereunder exceeds the sum of (A) the aggregate amount of Incentives credited against the draw paid by Chase hereunder plus (B) the aggregate amount of Incentive payments made by Chase to the Company hereunder, Chase shall pay the amount of such excess to the Company within 45 days after such termination.

4. **Billing and Payment:**

Billing and payment of all charges made using the Commercial Card Program are subject to the following:

a.  Billing Cycle/Payment Frequency: Monthly

b.  Payment Method Options for payments made by Company: Check, EDI, Wire Transfer, ESP/ACH, ACH Debit or Credit

0347

5. **Fees:**

    a.    Annual Administration Fee:

           Purchasing Cards: $ 0.00 per Card per year or $ 0.00 per Card per month.

           Provided, however, if no Cards are issued, the annual administrative fee shall be charged for each Account number.

    b.    Cash advance Fee: Per Transaction:
           2.5% of cash advance amount; minimum $2.50 per Transaction, maximum $30 per Transaction.

    c.    Late Payment Fee: For each product selected on Exhibit A, per occurrence:

           Purchasing Card grace period after statement billing date: 25 days
           1.0% late fee at 30 days
           2.5% delinquency fee at 60 days and every 30 days thereafter

    d.    Copy Retrieval Fee, Per Request: first three copy requests at no cost; additional copy requests $5.00 each. No charge if dispute related.

    e.    Returned Item (Insufficient Funds) Fee: $15.00 per occurrence

    f.    Complete Company Card Design and Production: $ 0.00 setup and $ 0.00 per Card.
           Company logo on Cards: $0.00 production fee -- waived.

    g.    Development of custom mappers: $100 per hour; minimum charge $400; no maximum charge.

    h.    Development of customized reports: $100 per hour; minimum charge $400; no maximum charge.

    i.    Use of Taxware tax calculation product: $5,000.

    j.    EDI: all development and on-going transmission fees will be passed on to Company.

    k.    PaymentNet set up fee: $ 0.00 .

    l.    File Transfer Protocol (FTP) – choose from the following: _X_ Daily ($0.00/month - Waived);
           ___Weekly ($250/month); ___ Bi-Weekly ($125/month); ___ Monthly ($75/month).

    m.    Convenience Checks: Two percent of check amount; minimum $2.00 per check; maximum $30.00 per check.

    n.    Training Consultant fee: Reasonable offsite training during implementation is provided at no cost; additional training: $750 per day per consultant offsite (no charge for training at Commercial Card Solutions' factilities in Salt Lake City, Utah).

    o.    Miscellaneous fees: Charges for other specialized services provided by Chase will be passed through to Customer.

0348

Chase Manhattan Bank USA, N.A.
05-2004

Universal Weather and Aviation, Inc. Agreement

Confidential

## 6. CONTACTS:

### Primary, Day to Day Contacts:

| Universal Weather and Aviation, Inc. | For Chase: Commercial Card Solutions |
|---|---|
| Name: James Hudnall | Name: Josh Burke |
| Title: Manager, Card Services | Title: Program Consultant - AVP |
| Address: 8787 Tallyho<br>Houston, TX 77061 | Address: 3949 South 700 East, Suite 500<br>Salt Lake City, Utah 84107 |
| Phone: (713) 944-1622 | Phone: (801)292-8652 |

### Notice Contacts:

| Universal Weather and Aviation, Inc. | For Chase: Commercial Card Solutions |
|---|---|
| Name: James Hudnall | Name: Richard Sorensen |
| Title: Manager, Card Services | Title: Vice President |
| Address: 8787 Tallyho<br>Houston, TX 77061 | Address: 3949 South 700 East, Suite 500<br>Salt Lake City, Utah 84107 |
| Phone: (713) 944-1622 | Phone: (801) 590-1800 |

### Financial Contacts:

| Universal Weather and Aviation, Inc. | For Chase: Commercial Card Solutions |
|---|---|
| Name: Doug Kelley | Name: Richard Sorensen |
| Title: CFO | Title: Vice President |
| Address: 8787 Tallyho<br>Houston, TX 77061 | Address: 3949 South 700 East, Suite 500<br>Salt Lake City, Utah 84107 |
| Phone: (713) 944-1622 | Phone: (801) 590-1800 |

0349

# FIRST AMENDMENT TO
# COMMERCIAL PURCHASING CARD AGREEMENT

THIS FIRST AMENDMENT (the "Amendment") TO Chase Commercial Card Program Master Agreement dated as of October 1, 2004 between **Chase Bank USA, NA**, formerly known as Chase Manhattan Bank USA, NA (the "Bank"), and **Universal Weather and Aviation, Inc.**, a Delaware corporation (the "Company") is made as of August 22, 2005.

The Bank and the Company agree to amend the Agreement as follows:

1.    Definitions.   Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.    Exhibit B.   The "Purchasing Volume Only" chart in Section 2 of Exhibit B of the Agreement is hereby deleted in its entirety and replaced with the following:

| PURCHASING VOLUME ONLY | Annual Net Spend | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Fileturn | $25,000,000-$49,999,999 | $50,000,000-$74,999,999 | $75,000,000-$99,999,999 | $100,000,000-$124,999,999 | $125,000,000-$149,999,999 | $150,000,000-$199,999,999 | $200,000,000 & Over |
| 5 Days or less | 1.56% | 1.64% | 1.69% | 1.72% | 1.74% | 1.75% | 1.76% |
| 6 - 10 Days | 1.50% | 1.58% | 1.63% | 1.66% | 1.68% | 1.69% | 1.70% |
| 11 - 15 Days | 1.45% | 1.52% | 1.57% | 1.61% | 1.62% | 1.63% | 1.64% |
| 16 - 20 Days | 1.39% | 1.47% | 1.51% | 1.55% | 1.56% | 1.57% | 1.59% |
| 21 - 25 Days | 1.33% | 1.41% | 1.46% | 1.49% | 1.51% | 1.52% | 1.53% |
| 26 - 30 Days | 1.27% | 1.35% | 1.40% | 1.43% | 1.45% | 1.46% | 1.47% |

If the actual average interchange rate falls below 2.20% or average transaction size is less than $500, Chase reserves the right to adjust the rebate.

3.    Continued Effect.   Except to the extent amended hereby, all terms, provisions and conditions of the Agreement, as it may have been amended from time to time, shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

4.    Counterparts.   This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

0350

IN WITNESS WHEREOF, the Bank and the Company have caused this Amendment to be executed by their respective authorized officers as of the effective date written above.

CHASE BANK USA, N.A.:

By: _____

Name: _____

Title: EILEEN P. GART~
ASSISTANT VICE PRESIDENT

UNIVERSAL WEATHER AND AVIATION INC.

By: _____

Name: ~AVE D~ULUS

Title: VP, UVAIR

0351

# SECOND AMENDMENT TO
# CHASE COMMERCIAL PURCHASING CARD PROGRAM

THIS SECOND AMENDMENT (the "Amendment") TO Chase Commercial Purchasing Card Program Master Agreement (the "Agreement") dated as of October 1, 2004 between Chase Bank USA, NA, formerly known as Chase Manhattan Bank USA, NA (the "Bank"), and Universal Weather and Aviation, Inc. (the "Company") is made as of October 25, 2005.

The Bank and the Company agree to amend the Agreement as follows:

1.     Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.     **Section 2. Performance Incentive. Calculation of Incentive** of the Agreement is hereby modified to include the following:

> For purposes of rebate calculation, the first year's rebate will be based upon Net Spend from July 1, 2005 through September 30, 2006. Thereafter, rebates will be calculated every Contract Year of Oct. 1st through September 30th. Additionally, if Net Spend reaches $1,250,000.00 for 3 consecutive months, the pricing incentive table will be expanded to include incentive percentages for Net Spend within a tier of $15,000,000 to $24,999,999.

3.     **Section 3. Draws Against Incentive, Subsection (i)** of the Agreement is deleted in its entirety and replaced with the following:

> (i)     Chase shall pay to the Company a draw against future Incentive payments in the amount of 100% of each Contract Year's estimated Incentive to be paid at the beginning of each Contract Year. If the amount of any draw paid by Chase exceeds the actual Incentive earned for that Incentive calculation period, such excess draw amount will be deducted from the following year's draw amount.

4.     Continued Effect. Except to the extent amended hereby, all terms, provisions and conditions of the Agreement, as it may have been amended from time to time, shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

5.     Counterparts. This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same

0352

document, and each party hereto may execute this Amendment by signing any of such counterparts.

IN WITNESS WHEREOF, the Bank and the Company have caused this Amendment to be executed by their respective authorized officers as of the effective date written above.

JPMORGAN CHASE BANK, N.A.:

By: _____
Name: _Terri E. Langford_
Title: _Ast. Vice Pres._

UNIVERSAL WEATHER AND AVIATION, INC.:

By: _____
Name: _David L. Divos_
Title: _V.P Network Services_

0353

# AMENDMENT TO
## CHASE COMMERCIAL CARD PROGRAM

THIS AMENDMENT (the "Amendment") to Chase Commercial Purchasing Card Program Master Agreement dated as of October 1, 2004, between Chase Bank USA, N.A. (the "Bank"), formerly known as Chase Manhattan Bank USA, N.A., and Universal Weather and Aviation, Inc., (the "Company"), is made as of December 15 , 2006.

The Bank and the Company agree to amend the Agreement as follows:

1.     Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.     Amendment. Section 4 of the Agreement is hereby amended by deleting the first sentence and inserting in place thereof the following:

"This Agreement shall have a term of five (5) years from the date of this Amendment and thereafter shall be successively renewed for one-year terms upon the anniversary of this Amendment unless otherwise terminated by either the Bank or the Company by giving written notice to the other party of such termination at least ninety (90) days prior to the expiration of the initial term or such applicable renewal term."

3.     Amendment. Exhibit A, Section 2.5 (d)(i)(B) to the Agreement is hereby amended by deleting this section and inserting in place thereof the following:

"The Company shall be liable for Fraud Losses, excluding amounts resulting from Transactions made on an Account after notification to the Bank by phone that such Account has been lost, stolen, misappropriated, improperly used or compromised. The Client will further be liable for Transactions after such notification has occurred if such Transactions result in a direct or indirect benefit to the Client or any Cardholder."

4.     Exhibit B. Exhibit B to the Agreement is hereby deleted in its entirety and replaced with a new Exhibit B in the form attached hereto as Exhibit B-1.

5.     Continued Effect. Except to the extent amended hereby, all terms, provisions and conditions of the Agreement, as it may have been amended from time to time, shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

6.     Counterparts. This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

IN WITNESS WHEREOF, the Bank and the Company have caused this Amendment to be executed by their respective authorized officers as of the effective date written above.

0354

CHASE BANK USA, N.A.:

By: _Clare J. Trauth_
Name: ___CLARE T. TRAUTH___
Title: ___VICE PRESIDENT___

UNIVERSAL WEATHER & AVIATION , INC.:
By: _____
Name: _Douglas D. Kelley_
Title: _EVP, CFO/Treasurer_

**Company Attestation:**

The undersigned, a duly authorized officer or representative of the Company, does hereby certify that the Company has been duly authorized to enter into and perform this Agreement and that the person signing above on behalf of the Company, whose execution of this Agreement was witnessed by the undersigned, is an officer, partner, member or other representative of the Company possessing authority to execute this Agreement.

By: _____ *

Name: _Randolf C. Henson_

Title: _Executive Vice President_
       _Chief Legal Officer and General Counsel_

*Note: The person signing the attestation shall be someone different from the person signing above on behalf of the Company.

0355

2

## DEFINITIONS

"Average Fileturn" means the number of days between the transaction posting date and the posting date of payment in full, averaged over the rebate calculation period.

"Average Large Ticket Transaction Size" means Large Ticket Transaction Volume divided by the total number of transactions included in the calculation of Large Ticket Transaction Volume.

"Charge Volume" means total U.S. dollar charges made on a Bank Commercial Card, net of returns, and excluding Large Ticket Transactions, cash advances, convenience check amounts, and fraudulent charges.

"Contract Year" will initially mean the period of time from the effective date of this Amendment through June 30, 2007 and thereafter will then mean the period of time from July 1 through June 30.

"Credit Losses" means all amounts due to Bank in connection with any Account that Bank has written off as uncollectable, excluding Fraud Losses.

"ExacTrac Charge Volume" means total U.S. dollar charges made on a virtual single use account used in connection with the ExacTrac System, net of returns, and excluding Large Ticket Transactions, cash advances, convenience check amounts, and fraudulent charges.

"Fraud Losses" means all amounts due to Bank in connection with any Account that Bank has written off as uncollectable as a result of a card being lost, stolen, misappropriated, improperly used or compromised.

"Large Ticket Transaction" means a transaction that the Associations have determined is eligible for a Large Ticket Rate.

"Large Ticket Transaction Volume" means total U.S. dollar Large Ticket Transactions made on a Bank Commercial Card, net of returns and excluding cash advances, convenience check amounts, and fraudulent charges.

"Losses" means all Credit Losses and Fraud Losses.

"Settlement Terms" means the combination of the number of calendar days in a billing cycle and the number of calendar days following the end of a billing cycle to the date the payment is due. Settlement Terms are expressed as X & Y, where X is the number of calendar days in the billing cycle and Y is the number of calendar days following the end of a billing cycle to the date the payment is due.

"Speed of Payment" means the number of calendar days after a billing cycle until the date full payment of the cycle end balance is received by the Bank.

"Virtual Single Use Account" means a Card-less Account used in connection with a single, unique transaction.

0356

REBATES

## Average Fileturn and Annual Charge Volume Rebates – Purchasing Card

Bank will pay the Client a rebate rate based on the Average Fileturn and Annual Charge Volume tier achieved in the following schedule.

| Average Fileturn | Annual Charge Volume ($MM) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $5.00 - $24.99 | $25.00 - $49.99 | $50.00 - $74.99 | $75.00 - $99.99 | $100.00 - $124.99 | $125.00 - $149.99 | $150.00 - $199.99 | $200.00 - & Over |
| 5 Days or Less | 1.46% | 1.56% | 1.64% | 1.69% | 1.72% | 1.74% | 1.75% | 1.76% |
| 6 - 10 Days | 1.40% | 1.50% | 1.58% | 1.63% | 1.66% | 1.68% | 1.69% | 1.70% |
| 11 - 15 Days | 1.36% | 1.45% | 1.52% | 1.57% | 1.61% | 1.62% | 1.63% | 1.64% |
| 16 - 20 Days | 1.29% | 1.39% | 1.47% | 1.51% | 1.55% | 1.56% | 1.57% | 1.59% |
| 21 - 25 Days | 1.23% | 1.33% | 1.41% | 1.46% | 1.49% | 1.51% | 1.52% | 1.53% |
| 26 - 30 Days | 1.17% | 1.27% | 1.35% | 1.40% | 1.43% | 1.45% | 1.46% | 1.47% |

## Average Fileturn and Annual Charge Volume Rebates – ExacTrac Charge Volume

Bank will pay the Client a rebate rate based on the Average Fileturn and Annual Charge Volume tier achieved in the following schedule. The $10.0M - $14.99M ExacTrac tier is only for the first Contract Year, this rebate will not apply to other Contract Years.

| Average Fileturn | Annual Charge Volume Spend ($MM) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $10.00 - $14.99 | $15.00 - $24.99 | $25.00 - $49.99 | $50.00 - $74.99 | $75.00 - $99.99 | $100.00 - $124.99 | $125.00 - $149.99 | $150.00 - $199.99 | $200.00 - & Over |
| 5 Days or Less | 1.15% | 1.31% | 1.41% | 1.49% | 1.54% | 1.57% | 1.59% | 1.60% | 1.61% |
| 6 – 10 Days | 1.09% | 1.25% | 1.35% | 1.43% | 1.48% | 1.51% | 1.53% | 1.54% | 1.55% |
| 11 - 15 Days | 1.03% | 1.21% | 1.30% | 1.37% | 1.42% | 1.46% | 1.47% | 1.48% | 1.49% |
| 16 - 20 Days | 0.97% | 1.14% | 1.24% | 1.32% | 1.36% | 1.40% | 1.41% | 1.42% | 1.44% |
| 21 - 25 Days | 0.91% | 1.08% | 1.18% | 1.26% | 1.31% | 1.34% | 1.36% | 1.37% | 1.38% |
| 26 - 30 Days | 0.85% | 1.02% | 1.12% | 1.20% | 1.25% | 1.28% | 1.30% | 1.31% | 1.32% |

## Average Fileturn Rebate Adjustment

Bank will adjust the rebate based on the Average Fileturn throughout the year according to the tier achieved in the following schedule.

| Average Fileturn | Rebate Adjustment |
|---|---|
| 29 | 0.00% |
| 28 | 0.01% |
| 27 | 0.02% |
| 26 | 0.03% |
| 25 | 0.04% |
| 24 | 0.05% |
| 23 | 0.06% |
| 22 | 0.07% |
| 21 | 0.08% |
| 20 | 0.09% |
| 19 | 0.10% |
| 18 | 0.11% |
| 17 | 0.12% |
| 16 | 0.13% |
| 15 | 0.14% |

0357

4

## Large Ticket Rebate

Bank will pay the Company an annual rebate based on annual Average Large Ticket Transaction Size and annual Large Ticket Transaction Volume according to the following schedule. The rebate will be calculated as the Rebate Rate times the annual Large Ticket Transaction Volume.

| Average Large Ticket Transaction Size | Rebate Rate |
|---|---|
| $4,500 - $5,000 | 0.50% |
| $5,000 - $7,500 | 0.45% |
| $7,500 - $10,000 | 0.40% |
| $10,000 - $15,000 | 0.35% |
| $15,000 - $20,000 | 0.30% |
| $20,000 - $25,000 | 0.25% |
| >$25,000 | 0.20% |

## General Rebate Terms

Rebates will be calculated annually in arrears. Rebate amounts are subject to reduction by all Losses. If Losses exceed the rebate earned for any Contract Year, Bank will invoice the Company for the amount in excess of the rebate, which amount shall be payable within 14 days. Upon termination of the Program, the Losses for the six-month period immediately preceding the termination will be deemed to be equal to the Losses for the prior six-month period. If the Company is participating in more than one program, Bank reserves the right to offset any losses from one program against any rebate earned under any other program.

To qualify for any rebate payment, all of the following conditions apply.
   a. Settlement of any centrally billed account(s) must be by automatic debit or by Company initiated ACH or wire.
   b. Payments must be received by Bank in accordance with the Settlement Terms. Delinquent payments shall be subject to a Past Due Fees as specified below. Settlement Terms are 30 & 14 (equivalent to 29 days Average Fileturn.)
   c. The Company is not in Default under the Agreement.
   d. Account(s) must be current at the time of rebate calculation and payment.

## Draws Against the Rebates

   (i)   The Bank shall pay to the Company a draw against future rebate payments in the amount of 100% of each Contract Year's estimated rebate to be paid at the beginning of each Contract Year. If the amount of any draw paid by the Bank exceeds the actual rebate earned for that rebate calculation period, such excess draw amount will be deducted from the following Contract Year's rebate amount.

   (ii)  The amount of such draw shall be credited against rebates earned by the Company until the aggregate amount of rebates so credited equals the amount of such draw.

   (iii) If the amount of the draw paid by the Bank hereunder exceeds the aggregate amount of rebate credited against such draw as of the date of termination of this Agreement, the Company shall pay the amount of such excess to the Bank within 45 days after such termination. If, as of the date of termination of this Agreement, the aggregate amount of rebates earned by the Company hereunder exceeds the sum of (A) the aggregate amount of rebates credited against the draw paid by the Bank hereunder plus (B) the aggregate amount of rebate payments made by the Bank to the Company hereunder, Bank shall pay the amount of such excess to the Company within 45 days of termination.

0358

5

Custom Plastics: at cost

Document retrieval fee: $8 per document (undisputed charges)

Statement Duplication: $5 per statement; $0 through PaymentNet

ACH return item: $29 per return

Return Check Fee:     $15 per return

Rush Card: $25 per card

International Transaction Fee: up to 1% of the transaction amount

**Optional Services**
FTP:
Daily: $500/month
Weekly: $250/month
Bi-weekly: $125/month
Monthly: $75/month

Cash Advance: 2.5% ($3.00 minimum)

Convenience Checks: 2% of check amount; minimum $1.50 per check; keying of payee name $1 per check

Rejected Convenience Check: $29 per check

Convenience Check Stop Payment: $29 per occurrence

**Other**
Should the Client request services not in this schedule, the Client agrees to pay the fee associated with such service.

0359